J-S54028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DUNBAR ASPHALT PRODUCTS, INC. AND DUNBAR ASPHALT, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GEM BUILDING CONTRACTORS AND DEVELOPERS, INC., FIDELITY AND DEPOSIT COMPANY OF MARYLAND, AND CONNEAUT SCHOOL DISTRICT | |
| v. | |
| JOHN ROTH, D/B/A ROTH PAVING, A/K/A JR ROTH PAVING, A/K/A PAVE MASTERS J.M. ROTH'S | |
| APPEAL OF: GEM BUILDING CONTRACTORS AND DEVELOPERS, INC. AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND | |
| | No. 266 WDA 2017 |

Appeal from the Judgment Entered February 13, 2017
In the Court of Common Pleas of Crawford County
Civil Division at No(s): A.D. 2008-2122

BEFORE: OTT, J., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.:      **FILED DECEMBER 4, 2017**

GEM Building Contractors and Developers, Inc. and Fidelity and Deposit Company of Maryland (collectively, "GEM")[1] appeal from the

_____

[*] Former Justice specially assigned to the Superior Court.

February 13, 2017 judgment entered[2] in the Crawford County Court of Common Pleas in favor of Dunbar Asphalt Products, Inc. and Dunbar Asphalt, LLC (collectively, "Dunbar") and John Roth, doing business as Roth Paving[3] (collectively, "Roth"). We affirm.

The December 7, 2016 opinion of the Honorable John A. Spataro set forth the detailed and complex factual and procedural history of this matter, which we adopt and incorporate herein. *See* Trial Ct. Op., 12/7/16, at 1-8. On December 7, 2016, following a non-jury trial, the trial court entered a verdict in favor of Dunbar and against GEM for $230,628.74, comprised of $78,074.94 in principal damages, $37,630.00 in interest damages under the

(Footnote Continued) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[1] Fidelity acted as surety on GEM's performance payment bond on the paving project and its interests are represented by GEM's counsel on appeal. Accordingly, we refer to GEM and Fidelity collectively as "GEM" throughout this memorandum.

[2] GEM purported to take its appeal from the January 17, 2017 order denying its post-trial motions. However, it is well-settled that "orders dismissing post-trial motions following a . . . trial are interlocutory and non-appealable until judgment has been entered on the docket." *Somerset Community Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 144 n.1 (Pa.Super. 1996). GEM filed a praecipe to enter judgment on January 30, 2017. The docket does not show that the Prothonotary entered judgment. On February 13, 2017, Dunbar filed a praecipe to enter judgment. The docket shows that the trial court acted on this praecipe and entered judgment that day. While GEM filed its notice of appeal on February 10, 2017, we nevertheless have jurisdiction over this appeal because judgment was subsequently entered on the docket. *See Jones v. Rivera*, 866 A.2d 1148, 1149 n.1 (Pa.Super. 2005).

[3] Roth Paving is also known as JR Roth Paving and Pave Masters J.M. Roth's.

Prompt Pay Act,[4] 62 Pa.C.S. §§ 3931-39, $69,616.89 in pre-judgment interest, and $45,306.91 in attorneys' fees. Similarly, the trial court entered a verdict in favor of Roth and against GEM for $160.461.65, comprised of $52,278.06 in principal damages, $21,921.96 in damages under the Prompt Pay Act, $46,321.53 in pre-judgment interest, and $39,940.10 in attorneys' fees.

On December 19, 2016, GEM filed a motion for post-trial relief, which the trial court denied on January 13, 2017. On February 10, 2017, GEM timely filed a notice of appeal.

GEM raises four issues on appeal:

1. Whether the Court erred in finding that the unsigned written contract between GEM and Roth was of no consequence?

2. Whether the Court erred in finding that GEM contracted with [Dunbar and Roth] for the paving project?

3. Whether the Court erred in its assessment of damages?

4. Whether the Court erred in the manner in which it conducted the bench trial?

GEM's Br. at 4.

_____

[4] Because it acted as surety for a performance bond, Fidelity was found jointly and severally liable for the principal damages – $78,074.94 – and interest damages under the Prompt Pay Act – $37,630.00 – awarded to Dunbar. The trial court did not hold Fidelity jointly and severally liable for attorneys' fees and costs under the Prompt Pay Act.

GEM's first two issues are intertwined. At trial, GEM asserted that the terms of an unsigned written document, sent to Roth and on which Roth performed, controlled. Dunbar and Roth, however, contended that GEM had an oral agreement with Dunbar, wherein GEM agreed to pay Dunbar the contract price and agreed that Dunbar would pay Roth for paving services. On appeal, GEM argues that the trial court erred in not enforcing the unsigned written "contract" between GEM and Roth and in finding instead that GEM had entered an oral contract with Dunbar. GEM asserts that the terms of the unsigned written agreement were confirmed when Roth's attorney wrote a letter to the president of GEM, Gale Measel, "confirming that Roth would be performing under the subcontract." GEM's Br. at 13. According to GEM, the contract price of $113,353.00 shows that GEM contracted with Roth for the paving, making Roth responsible for paying Dunbar.

We review non-jury verdicts as follows:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court

because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Stephan v. Waldron Elec. Heating and Cooling LLC*, 100 A.3d 660, 664-65 (Pa.Super. 2014) (quoting *Wyatt, Inc. v. Citizens Bank of Pa.*, 976 A.2d 557, 564 (Pa.Super. 2009)) (alterations in original).

The record supports the trial court's conclusion that the parties did not agree to be bound by the unsigned written document. While we recognize that "signatures are not required unless such signing is expressly required by law or by the intent of the parties," *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 146 (Pa. 1999), it is equally clear that a "contract is created where there is mutual assent to the terms of the contract by the parties with the capacity to contract," *id.* The trial court concluded that while Roth's attorney "accepted the work scope per his letter to Greg Measel on July 30, 2007, [he] expressly reject[ed] the remaining terms and conditions of the draft subcontract, which were to be 'redefined.'" Trial Ct. Op., 12/7/16 at 10. We find no basis to disturb that finding on appeal.

Accordingly, we turn to the trial court's determination that there was a valid oral agreement between GEM and Dunbar, rather than between GEM and Roth. "When oral contracts are disputed, the issues of what was said, done, and agreed upon by the parties are ones of fact to be determined by the fact finder. Also, the question of the intent of the parties is a factual one reserved to the province of the fact finder." *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 783 (Pa.Super. 2006) (internal citation omitted). The

trial court concluded that GEM entered into an agreement with Dunbar, who in turn was to pay Roth for its paving work. *See* Trial Ct. Op., 12/7/16, at 8-10, 12-13. Upon reviewing the record and the applicable law, we conclude that the trial court did not err in reaching this conclusion.

In essence, GEM challenges the trial court's credibility findings. *See* Trial Ct. Op., 12/7/16, at 9-10 (explaining reasons for "accept[ing] as truthful all of the testimony of [Dunbar's witness] and discredit[ing] any contrary testimony offered by [two of GEM's witnesses]"). However, it is well settled that "[i]n a non-jury trial, the fact[-]finder is free to believe all, part, or none of the evidence, and [this] Court will not disturb the trial court's credibility determinations." *L.B. Foster Co. v. Charles Carcciolo Steel & Metal Yard, Inc.*, 777 A.3d 1090, 1093 (Pa.Super. 2001).

Similarly, we reject GEM's argument that the trial court erred by "picking and choosing" from the various writings surrounding the oral agreements to determine the essential terms of its agreement with Dunbar and Roth. "[I]n cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." *Mountain Properties, Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa.Super. 2001) (quoting *Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa.Super. 1993)). Accordingly, to determine the terms of any agreements among GEM, Dunbar, and Roth, the trial court properly examined the documentary and testimonial evidence

to determine that GEM and Dunbar had an agreement, which was driven by Dunbar's reluctance to extend Roth a large line of credit for the asphalt necessary to pave the parking lot.

Next, GEM argues that the trial court erred in assessing damages. This claim is predicated on a finding that GEM had a written agreement with Roth and that GEM did not have an agreement with Dunbar. Because we conclude that the trial court did not err in finding that the unsigned written document did not control and that GEM had an agreement with Dunbar rather than Roth, we conclude that GEM's arguments are meritless.

Finally, GEM argues that the trial court erred in precluding GEM from "properly present[ing its] case and defend[ing] against each party's claim" at trial. GEM's Br. at 23. According to GEM, because the trial court attempted to conduct the trial in one day, it improperly allowed the parties to present testimonial evidence beyond the scope of direct examination. GEM asserts that "[t]his manner of conducting the trial not only prevented [it] from properly defending claims, but also allowed much testimony that would otherwise not have been permitted." *Id.* at 24. This claim does not merit relief.

It is well-settled that the "conduct of a trial is [within] the province of the judge. . . . [and h]is discretion, exercised without abuse, must control." *De Fulvio v. Holst*, 362 A.2d 1098, 1099 (Pa.Super. 1976). In its opinion denying GEM's post-trial motions, the trial court explained why it conducted the trial in such a manner:

- 7 -

> At the one-day trial, Dunbar rested its case after calling four witnesses; [GEM] and . . . Roth both conducted cross-examination, in that order. [GEM] then called G[ale] Measel for the limited purpose of defending the action brought by Dunbar. Following cross-examination and redirect, he remained on the witness stand to testify, along with Greg Measel and David Foreman, as to [GEM's] claims against Roth. Roth and Dunbar, in that order, conducted cross-examination. Roth then called John Roth and Jeffrey Gould, who were cross-examined by [GEM] and Dunbar, in that order. Conneaut School District's counterclaim against Dunbar was not pursued, and the crossclaim of Fidelity against Conneaut School District was not yet ripe. Thus, the conduct of the trial was not "unstructured," as the Court "did permit each party to take turns putting on its case-in-chief," and did not "let the parties put in their evidence in any order in one lump sum, as alleged in the Motion (¶ 24).

Trial Ct. Op., 1/13/17, at 7.

Although the trial court did, at times, allow the parties to elicit testimony outside the scope of direct examination, it did so only where the testimony would have been elicited when that party recalled the witness on direct examination in its case-in-chief. After that testimony was elicited, the trial court permitted other parties to cross-examine the witness on those matters. It is evident that the trial court reasonably sought to conduct the trial so as to allow witnesses to testify in one session, rather than disrupt their schedules by recalling witnesses for each party's case-in-chief. Under these circumstances, we find no abuse of discretion.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/4/2017

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA

CIVIL ACTION – AT LAW

DUNBAR ASPHALT PRODUCTS, INC., and :
DUNBAR ASPHALT, LLC, :
     Plaintiffs :
     :
     :
v. :    No. AD 2008 – 2122
     :
GEM BUILDING CONTRACTORS AND :
DEVELOPERS, INC., FIDELITY AND :
DEPOSIT COMPANY OF MARYLAND, and :
CONNEAUT SCHOOL DISTRICT, :
     Defendants :
     :
v. :
     :
JOHN ROTH T/D/B/A ROTH PAVING :
A/K/A J R ROTH PAVING A/K/A :
PAVEMASTERS J M ROTH'S, :
     Additional Defendant :

*Richard J. Parks, Esq., Attorney for Plaintiffs*
*Christopher P. Skatell, Esq., Attorney for Defendants*
*Carmen F. Lamancusa, Esq., Attorney for Additional Defendants*

**MEMORANDUM and ORDER**

Plaintiffs, Dunbar Asphalt Products, Inc. and Dunbar Asphalt, LLC (hereinafter referred to in the singular as "Dunbar") initially brought this action on November 26, 2008, against GEM Building Contractors and Developers, Inc. ("GEM"), Fidelity and Deposit Company of Maryland ("Fidelity"), and Conneaut School District ("Conneaut"), demanding judgment against Dunbar, Fidelity and Conneaut in the amount of $85,796.67, plus interest at the rate of eighteen percent per annum from January 3,



2008, costs of suit and attorney's fees. Dunbar claimed nonpayment by GEM for the asphalt and related services provided under an agreement with GEM, the general contractor retained by Conneaut for an extensive construction project that included renovations at the Conneaut Valley Elementary School ("School"). The action against GEM was in the nature of a contract action. The action against Conneaut was upon the theory of unjust enrichment. The action against Fidelity was based on the performance payment bond issued by Fidelity.

On May 13, 2009, Dunbar filed an amended complaint, addressing preliminary objections that had been filed previously and addressed by the Court in a Memorandum and Order filed April 23, 2009. Conneaut, in answering the amended complaint on June 29, 2009, asserted a counterclaim against Dunbar, and crossclaims against GEM and Fidelity for indemnity. GEM and Fidelity filed their answer on July 14, 2009, with Fidelity making a crossclaim against Conneaut for indemnity and/or contribution.

Previously, on April 17, 2009, GEM and Fidelity had filed a complaint (joinder complaint) to join additional Defendant John Roth, t/b/d/a Roth Paving, a/k/a J R Roth Paving, a/k/a Pavemasters J M Roth's (collectively, "Roth"). In this complaint, GEM alleged that Roth and GEM were parties to a subcontract dated July 9, 2007, that required Roth to pave the School parking lot for the sum of $113,353.00. GEM denied any contractual duty to Dunbar and asserted that if Dunbar was owed any money, then it was Roth, not GEM, that owed money to Dunbar. GEM and Fidelity demanded indemnity against Roth if found liable to Dunbar. GEM claimed damages against Roth for faulty workmanship in paving the parking lot, contending that Conneaut rejected the work and then refused to pay GEM.

Preliminary objections to the joinder complaint were addressed by the Court's Memorandum and Order filed on November 9, 2009. Roth then filed its answer, new matter, counterclaim and crossclaim on November 25, 2009, and an amended answer, new matter, counterclaim and crossclaim on January 19, 2010. The new matter asserted that a representative of GEM, Greg Measel, had requested a quote from Roth in July of 2007 to provide a new asphalt parking lot at the School. In response, Roth offered to perform the work for the sum of $113,353.00, which was accepted by GEM, and later augmented by a claim for $17,000.00 to compensate Roth for additional work.

2

The counterclaims, incorporating the new matter, demanded damages against GEM for breach of contract and for violation of the Prompt Pay Act, 62 Pa.C.S.A. §§ 3931–3939 (erroneously referred to therein as the Commonwealth Procurement Code). The crossclaim against Conneaut, in the alternative, was for unjust enrichment. Roth subsequently filed a motion for summary judgment on its counterclaims against GEM, which was denied by Memorandum and Order filed on June 25, 2014.

Dunbar also, on June 17, 2015, moved for partial summary judgment against Conneaut on the unjust enrichment claim, after it was learned that Conneaut, GEM and Fidelity had executed a settlement agreement on or about July 8, 2009. Pursuant to that agreement Conneaut paid GEM $287,000.00, inclusive of the paving work at the School, in essence accepting the paving work performed by Roth, with material, ancillary supplies and labor provided by Dunbar. By Memorandum and Order filed August 18, 2015, this motion for partial summary judgment was denied, the case then becoming ripe for trial.

The nonjury trial was held on October 17, 2016.[1] Jody Sperry, President of Conneaut's Board of Directors, testified at the request of Dunbar. She confirmed that a settlement agreement was reached, but was unclear of the details. She indicated that she was unaware of any ongoing problems with the parking lot in question, and assumed that all the contractors associated with the building project completed some eight years earlier were paid.

Conneaut's current Superintendent, Jarrin Sperry, testified at the request of Dunbar. He also testified that he was unaware of any difficulties with the paving at the School of a major nature. He stated that the parking lot is currently in use.

Elwood Schell, who retired from Conneaut in July of 2016, testified at the request of Dunbar. He had been the maintenance supervisor for Conneaut's entire physical plant, which included six buildings. He recalled the 2007 project. As maintenance supervisor, he attended all construction meetings. He was aware of the contract between GEM and Conneaut. He was aware that Dunbar provided the asphalt for the

---

[1] Considering the complexity of the trial and the lack of time to entertain closing arguments, the Court permitted counsel to submit closing arguments in writing. Although Plaintiffs' closing argument filed on November 9, 2016, was untimely, the Court finds no prejudice to the Defendants or Additional Defendants, and accepts as counsel's explanation that there were logistical difficulties in timely filing the closing argument, in part because the Courthouse was closed on Election Day, November 8, 2016.

project. He was familiar with Greg Measel, the construction foreman for GEM, and frequently spoke with him. Mr. Schell was alerted to paving problems, such as areas of the sub-base that were not quite level and soft spots that required further action. He was aware that Roth performed the paving. His understanding was that final payment was made to GEM, and that all claims against Conneaut were released as a consequence. He testified that "the paving was accepted by [Conneaut], as is." Although he was aware that Dunbar and Roth performed services, he was not aware of the terms and conditions of the contracts between these entities. He admitted that there had been concerns after the paving project was completed and that it became necessary for core drilling to take place, along with additional testing to determine whether the paving satisfied the specifications. There were concerns relative to compaction. He referred to the one area as a "bird bath" at the south parking lot. He personally inspected the corrective work that was done to address the soft spots and found the work to be satisfactory. The paving was accepted and, after eight years of use, there appear to be no residual problems despite the concerns initially raised.[2]

Bradley Berlin, President of Dunbar, testified. In his capacity as President, he is responsible for the day-to-day management of the corporation. He was contacted by John Roth in the summer of 2007 for a paving project. Having previously supplied asphalt to Mr. Roth, he had concerns as to the size of the project and Mr. Roth's financial ability to cover the cost of the asphalt. He intended to contract with GEM for the asphalt because of the size of the project, requiring 1,500 tons of asphalt. Mr. Berlin then contacted Gale Measel, President of GEM. Exhibit V, an undated memorandum addressed to Gale Measel from Mr. Berlin, was offered and admitted into evidence to document Mr. Berlin's telephone conversation with Gale Measel that took place on or before August 5, 2007, during which Mr. Measel confirmed that the total paving contract price of $113,353.00, as negotiated between GEM and Roth, was to be paid entirely to Dunbar, which would then pay Roth for the work Roth performed. A $5,353.00 discount was offered to Mr. Measel in return for an upfront payment of ninety percent of the

---

[2] The Court is cognizant that by letter to Roshelle Fennell, Project Manager, dated February 1, 2008, Foreman Architects and Engineers rejected "the asphalt paving and subbase in its entirety" (Exhibit D). This is of no consequence because Ms. Fennell attributed the defects to the subbase, which was GEM's responsibility (Exhibit X, "the problem is not really with the paving. The true problem is with the grading of the subgrade and/or subbase"), and in any event, Conneaut accepted the paving and paid GEM.

4

contract price. The memorandum stated in part, "[A]s discussed, no payments will be made from Dunbar to Roth until completion of the project." Although Mr. Measel never responded to Mr. Berlin, Exhibit V corroborates the testimony of Mr. Berlin that supplying the asphalt was contingent upon GEM becoming contractually bound to Dunbar.

In preparing for trial, Mr. Berlin discovered that there had been a miscalculation as to the amount demanded in the original and amended complaint. He then testified that the principal amount presently due is $78,074.94, not $85,796.67 as originally sought. He testified that attorney's fees incurred were $30,000.00 as of the date of the trial. Offered and admitted into evidence was Exhibit VII, representing Dunbar's demand against Fidelity.

Mr. Berlin testified that the decision to supply the asphalt without receiving any upfront payment from GEM was because of the "desperation" expressed by GEM in completing the project before the school year began, along with an appreciation that Gale Measel was required to address an unrelated fire loss to one of GEM's buildings. Various dates for commencement and completion of the project were mentioned during the course of the trial, with the apparent intent to have the paving completed on or before August 15, 2007, with work to have commenced on or around August 6. Additional asphalt was necessary to address the "bird bath" problem in the paving that was discovered in the fall of 2007. Mr. Berlin testified that his company is normally paid within 30 to 60 days of invoice issuance. Exhibit I is a series of invoices, the first issued on August 10, 2007, identifying GEM as the customer in the upper right hand block, followed by several invoices issued thereafter, none of which was ever paid.

Plaintiff called Gale Measel, President and sole owner of GEM, as on cross examination. Mr. Measel testified that Smith Paving was the intended subcontractor for the paving. He stated that Smith Paving was unable to perform the subcontract, which is why, with time of the essence, GEM contacted Roth to perform the paving work. He was vague as to whether or not he communicated with Mr. Berlin, indicating that he "could have." He denied ever receiving a written document or note from Mr. Berlin. He denied knowing the amount of asphalt that was delivered to the site. He testified that the notice to proceed and purchase order of July 9, 2007, was issued only to Roth, not

Dunbar. He denied any intention to provide payment to Dunbar. He denied that his son, Greg Measel, who served as construction foreman, had authority to bind GEM to any contracts. He denied that Conneaut ever accepted the parking lot. He asserted that Conneaut never paid for the paving, and that the settlement agreement of July 8, 2009, was only for the purpose of closing out GEM's contract with Conneaut. He admitted that GEM was paid $278,000.00 from Conneaut in accord with the settlement agreement. When confronted with the settlement agreement (Exhibit III) as against GEM's AIA Submittal Request for payment dated October 1, 2008 (Exhibit II) that made a claim for paving services, he persisted in denying that the paving was paid for or accepted by Conneaut, without offering any explanation for how that could have been possible.[3]

Greg Measel, Gale's son, was called as a witness. He had on-site responsibility for the project on behalf of GEM during the spring and summer of 2007. He found himself without a paving contractor as summer approached, after learning that Smith Paving was no longer available to perform the service. He reached out in the spring of 2007 to several contractors in search for a subcontractor to perform the paving. At some point, he spoke with John Roth, outlining the scope of work and agreeing to a contract price of $113,353.00. He sent Roth a notice to proceed on July 5, 2007 (Exhibit G), and subsequently prepared a standard form contract, dated July 9, 2007 (Exhibit A). This contract was identical, except for the contract price, to the contract intended for Smith Paving (Exhibit IX). Roth's attorney, Carmen F. Lamancusa, Esq. replied to the July 9 draft, stating that the "work scope" was acceptable, but that the remaining terms of the contract "must be redefined." The draft contract was never revised or signed. Roth commenced the project without a completed written contract at GEM's urging because time was running short. Indeed, the notice to proceed was issued the same day Attorney Lamancusa indicated that the scope of work and contract price was acceptable, but the balance of the contract was not.

The scope of work agreed upon did not include installation of the sub-base. When Roth appeared at the site to commence paving, the sub-base and sub-grade

---

[3] See Page 6 of 7 of AIA document G703, with an application date of October 1, 2008, specifically item numbers 76.110 and 76.120.

were not fully completed. Much additional grading was necessary prior to Roth performing its duties under the contract. GEM was in the process of completing site preparation, while Roth was at the site ready to proceed. Roth was required to then wait and assist GEM in site preparation, necessitating a request to Dunbar that its asphalt plant operate on a Sunday so that the paving would commence in a timely manner.

Because of the failure to have the site properly prepared in advance of Roth's arrival, Roth submitted the equivalent of a change order by letter to GEM dated August 22, 2007, requesting that there be an additional $17,000.00 added to the original contract price of $113,353.00. Mr. Roth felt this to be "a more-than-fair price" because the job "was to be site-ready to pave and would have taken four days at most to complete." It took seven days rather than four to complete the project (Exhibit XIX). In direct reply to the change order, Greg Measel, in his letter to Roth of August 22, 2007 (Exhibit XIX(a)), "authorized the T&M [time and material] costs to help complete rough grade sub-base installation for GEM in addition to your required fine grading of the sub-base." His letter of August 22, 2007, ratified the pre-existing contractual arrangement for Roth's performance of the scope of work for the sum of $113,353.00, plus $17,000.00 for the additional time and material to perform on the contract due to GEM's failure to have the area site ready, as contemplated in the scope of work.

David E. Foreman testified in his capacity as Vice President of Foreman Architects and Engineers at the time of construction. He verified that the sub-base was insufficient and indicated that there should not be payment until the matter was resolved.

John Roth testified that Greg Measel had called him in the early part of 2007. He testified that Greg Measel had inquired about Roth's interest in paving the School lot. Although he had never undertaken a job this large, Mr. Roth expressed his interest in the project. He indicated that he met with Mr. Measel, and made it clear to him that it was essential that the area be site ready because he (Roth) did not have the necessary equipment to install a sub-base and do the rough grading. He was only capable of doing fine grading, proofing and then proceeding with the paving. Laying the two-way aggregate stone for the sub-base was entirely GEM's responsibility. The plan was for

Roth to apply two layers, a binder with top layer and then base coat. He was then to seal the edges and joints, which he subcontracted to Russell Standard. He was asked to do the striping, which he agreed to do provided that he was paid upfront. He used anywhere from eight to ten employees at the job site. He was at the time receiving cancer treatments, and was surprised to hear from his foreman, Jeffrey Gold, of the failure of the site to be ready for paving. Roth employees were enlisted to help GEM complete the installation and grading of the sub-base. As far as Mr. Roth was aware, the work was acceptable to everyone except for a few soft spots and the "bird bath" that he properly addressed.

Mr. Roth prepared the necessary documentation for payment, identified as Exhibits XXIII and XXIV, with the assistance of GEM's secretary. These invoices were never paid. He testified that he did "a heck of a lot" of work beyond that which was contracted to be performed. He accommodated Greg Measel because of the desperation expressed in having the paving completed before the start of the school year. He has checked on this parking area periodically over the years, noting that it looks good. Several photographs were admitted into evidence, all of which demonstrate that the parking lot is in good order.

After Mr. Roth became aware of the settlement, he approached Gale Measel at various times requesting payment. In every instance, he was rebuffed. He testified to having substantial legal expenses incurred in connection with this matter, including $31,940.10 to Blooming & Gusky, LLP (Exhibit 29), $5,000.00 to Culbertson, Weiss, Schetroma and Schug, P.C., and $3,000.00 to Attorney Lamancusa.

Jeffrey Gold, an employee of Roth, was called to testify. He corroborated the testimony of John Roth in nearly every respect. In particular, he testified that there were anywhere from nine to ten employees at the site, and that the equipment that they utilized was not designed for such heavy duty work as applying a sub-base, as his equipment consisted of a paver, a skid steer, a roller, and some trucks. The failure of GEM to have the site properly prepared for paving delayed his work crew, which had to help GEM employees in completing the sub-base.

Having summarized the evidence presented at trial, we now address each of the various causes of action with our findings and conclusions:

8

DUNBAR v. GEM

In the late spring or summer of 2007, John Roth was contacted by Greg Measel, who had an urgent need to obtain a subcontractor willing on relatively short notice to perform the paving subcontract at the elementary school. Having been apprised of the situation, John Roth communicated with Bradley Berlin of Dunbar for the purpose of inquiring as to the availability of approximately 1,500 tons of asphalt. While Mr. Berlin was interested in accommodating Mr. Roth, a good customer over the years, he knew that the amount of asphalt required for the project was well in excess of prior dealings with Mr. Roth, leading to the conclusion that extending credit for such a large quantity of asphalt was not advisable. Obtaining the name of Greg Measel from Mr. Roth, Mr. Berlin contacted Mr. Measel, who referred him to Gale Measel, GEM's president. Mr. Berlin made it clear to Gale Measel that Dunbar would commit to providing asphalt for the elementary school paving project only if Dunbar was the contracting party with GEM and not Roth and, furthermore, that GEM would pay directly to Dunbar the entirety of the negotiated paving project price of $113,353.00. Dunbar would, in turn, pay Roth. Gale Measel committed GEM to entry into an oral contract with Dunbar for the provision of asphalt for the elementary school project, and to paying the entirety of the paving project contract price to Dunbar.

In making the foregoing findings, we accept as truthful all of the testimony of Bradley Berlin and discredit any contrary testimony offered by either Gale or Greg Measel. This credibility determination is based upon several factors, not least of which was the testimonial demeanor of Mr. Berlin when contrasted with that of both Greg and, particularly, Gale Measel. Beyond that, Mr. Berlin's testimony is supported by the reasonable nature of his demand that GEM, rather than Roth, be the contracting party because Roth had never undertaken a project of this size in the past. No evidence was offered to demonstrate that a paving contract of this nature was common for Roth. Mr. Berlin's memorandum to Gale Measel corroborates Mr. Berlin's testimony. The memorandum refers to "our conversation" that set forth the contract price of $113,353.00, offset by a discount of $5,353.00, for a net payment of $108,000.00, if ninety percent of that amount was paid by August 8, 2007. The balance of $10,800.00 would then be payable upon completion of the project. GEM offered no evidence to the

contrary. Although it is unclear as to when this undated memorandum was sent or received by GEM, it would have been sent before work commenced on the project, which most likely began on or about August 6 and concluded on or about August 14 of 2007. See Exhibit 23 and Exhibit L.

Exhibit G, the e-mail from Greg Measel to John Roth, with a copy to Gale Measel, sent on July 5, 2007, wherein Greg Measel issued "a notice to proceed based on our discussion of the total paving price being $113,353.00," confirms the contract price. Although the contract price was established, the payment terms were not. The payment terms and provision of asphalt by Dunbar came later, after GEM committed to Dunbar for the asphalt, agreeing to pay Dunbar the full paving contract price.

The draft subcontract dated July 9, 2007, prepared by GEM and conveyed to John Roth, is of no consequence except to the extent that the "work scope" appearing in the document represents the work that was to be performed by Roth. Attorney Lamancusa, on behalf of Roth, accepted the work scope per his letter to Greg Measel of July 30, 2007, while expressly rejecting the remaining terms and conditions of the draft subcontract, which were to be "redefined" (Exhibit L). GEM's effort to have the Court interpret the provisions of Paragraph 3 of the draft subcontract, titled "Execution and Attempted Modification of Subcontract Agreement," as binding is misplaced for the simple reason that the draft subcontract was never signed or ratified.

Although there remained problems after Roth completed the paving project, there is no evidence that Dunbar in any way breached its contract with GEM. Dunbar, moreover, provided additional asphalt at no additional cost for Roth's remedial work performed in the summer of 2008, to the satisfaction of Conneaut. Dunbar is without fault and is entitled to the benefit of the bargain it reached with GEM, as described in Mr. Berlin's undated memorandum to Gale Measel (Exhibit V).

In calculating the damages to which Dunbar is entitled, we note that the Prompt Pay Act applies.[4] Evidence offered during the course of the trial supports an award of attorneys fees in the amount of $45,306.91. A post trial motion may be necessary to

---

[4] Act of May 15, 1998, P.L. 358, No. 57 §§ 3931–3939 (as amended and codified at 62 Pa.C.S.A. §§ 3901-3942). The Contractor and Subcontractor Payment Act ("CASPA"), Act of Feb. 17, 1994, P.L. 73, No. 7 (as amended and codified at 73 P.S. §§ 501–516), is inapplicable here. *Clipper Pipe & Service, Inc. v. Ohio Casualty Insurance Co.*, 631 Pa. 682, 692, 115 A.3d 1278, 1294 (2015) ("we conclude that CASPA does not apply to a construction project where the owner is a governmental entity").

more firmly establish the current amount of attorneys fees to which Dunbar is entitled. For now, the award is based upon the evidence offered to this point in time. This Court finds as well that the defenses raised by GEM throughout this protracted litigation have consistently been without merit on the core issues relating to the nonpayment to both Dunbar and Roth for services and materials properly rendered. GEM's assertion that both Dunbar and Roth are entitled to no monetary award whatsoever, on the pretext that Conneaut rejected the performance of Roth and never paid GEM, was disingenuous from the outset.

In summary, Dunbar is entitled to receive damages in the principal amount of $78,074.94, plus interest at the legal rate of six percent per annum from November 26, 2008 (when its complaint was filed),[5] together with a penalty of one percent per month for having withheld payment in bad faith after July 8, 2009,[6] and attorney fees and expenses as the prevailing party.[7]

## DUNBAR V. FIDELITY

The action against Fidelity is on the performance payment bond. The terms and conditions of the bond require Fidelity, as surety, to pay for all labor, materials, and supplies furnished for the project unless the contractor has promptly made payment for all sums due. (Exhibit VI). The contractor has not promptly made payment to Dunbar, entitling Dunbar to judgment against Fidelity in the amount of the principal due, without application of the Prompt Pay Act penalty and attorney fees,[8] but with legal interest.

---

[5] The Prompt Pay Act provides for an interest rate equal to the interest rate on overdue taxes [i.e., 7% in 2008, 5% in 2009, 5% in 2010, and 3% since 2011], when a *progress* payment is not made when due to a contractor or subcontractor. *Id.* §§ 3932(c), 3933(d). Provision is also made for interest (up to 10%) when *final* payment to the contractor is not made when due. *Id.* § 3941(b). There is no corresponding provision for interest on late payment of the final amount due to a subcontractor, and as no progress payments are involved in the instant action, we have elected to apply the legal rate of interest of six percent. See 41 P.S. § 202; *Fernandez v. Levin*, 519 Pa. 375, 379, 548 A.2d 1191, 1193 (1988) (addressing prejudgment interest); Restatement (Second) of Contracts § 354 (1981).

[6] 62 Pa.C.S.A. § 3935(a). July 8, 2009 is the date of the concealed settlement agreement among GEM, Conneaut and Fidelity. Because GEM had committed to pay the entire paving amount to Dunbar, including Roth's portion, for which there may have initially been some deficiencies, we cannot say that GEM was acting in bad faith in withholding payment from Dunbar prior to Conneaut's acceptance and payment to GEM pursuant to the settlement agreement.

[7] *Id.* § 3935(b).

[8] A bonding company is not liable for penalties or attorney fees awarded pursuant to the Prompt Pay Act. *A. Scott Enterprises, Inc. v. City of Allentown*, 142 A.3d 779, 788 (Pa. 2016).

## DUNBAR v. CONNEAUT

The action against Conneaut is based upon unjust enrichment. A person is enriched if he has received a benefit, and unjustly enriched if the retention of the benefit would be unjust. Restatement (First) of Restitution § 1 (1937), Comment (a). While it can be said that Conneaut was enriched, its enrichment was not unjust. *See D.A. Hill Co. v. Clevetrust Realty Investors*, 524 Pa. 425, 433-34, 573 A.2d 1005, 1010 (1990). Conneaut paid for the asphalt and the paving work by virtue of its settlement with GEM in July, 2009. Therefore, we will enter judgment in favor of Conneaut.

## CONNEAUT v. DUNBAR

This action for attorney fees was not pursued, and will be dismissed.[9]

## GEM v. ROTH and ROTH v. GEM

This Court finds in favor of Roth, incorporating all of the findings referred to above with respect to the action by Dunbar against GEM. The Court finds credible the testimony of John Roth and Jeffrey Gold, to the exclusion of any contrary evidence offered by either Greg Measel or Gale Measel. The testimony of John Roth and Bradley Berlin were consistent: Mr. Roth understood that GEM was to pay the entirety of the contract price to Dunbar which would, in turn, remit to Roth the amount due Roth. Mr. Roth informed Bradley Berlin of his conversations with Greg Measel, which lead Mr. Berlin to communicate with Greg Measel and later Gale Measel for the very purpose of establishing the payment arrangement. Roth alone is entitled to the $17,000.00 which was added to the original contract price of $113,353.00, as set forth in Exhibit XIX(a).

What differentiates Roth from Dunbar is that, unlike Dunbar, there were problems identified after completion of the project noted by the construction manager to be "with the grading of the subgrade and/or sub-base." See Exhibit 27. The grading of the subgrade and/or sub-base was the primary responsibility of GEM, not Roth. While core samples were taken which suggest that there may have been imperfections relating to the depth of the asphalt applied, no evidence was offered to suggest that these imperfections represented material noncompliance with the specifications. The

---

[9] Conneaut states in its joint "Closing Statement and Supporting Brief" that it "did not prosecute this claim at trial and does not do so herein."

undisputed testimony is that Conneaut ultimately accepted the project and, after eight years of use, the parking lot has stood the test of time.

GEM's defense to the payment of Roth is that GEM was never paid by Conneaut because the paving did not meet the specifications of the contract. The evidence demonstrates that GEM <u>was</u> paid for the paving, albeit perhaps discounted in some amount for which no evidence was offered. There was at least substantial compliance by Roth, and the paving work was accepted by Conneaut. While we note that the settlement amount of $287,000.00 is less than the total amount demanded by Roth, no evidence was offered as to what portion of the difference, if any, was attributable to the paving. We can only conclude that GEM was paid the full amount of the paving component of the contract since there were any number of deficiencies claimed by Conneaut against GEM having nothing to do with the paving.

Even if, moreover, Conneaut never paid GEM for the paving, this would not release GEM from honoring its contract with Roth, because the paving was accepted by Conneaut and the record supports the conclusion that the parking lot is in good order. If GEM entered into a settlement agreement with Conneaut that provided no money for the asphalt or paving, it is GEM that must bear the loss, not Dunbar or Roth, because the parking lot has been accepted.

Roth is entitled to receive damages in the principal amount of $52,278.06, being the sum of the $113,353.00 contract price plus $17,000.00 for additional work, less the $78,074.94 due Dunbar for asphalt. Interest is also due at the legal rate of six percent per annum from November 25, 2009 (when its counterclaim was filed).[10] The Court will also exercise its discretion under the Prompt Pay Act in awarding a penalty of one percent per month for payment having been withheld in bad faith after July 8, 2009 when GEM settled with Conneaut and Fidelity,[11] together with attorney fees and expenses as the prevailing party.

---

[10] See note 5, above.

[11] 62 Pa.C.S.A. § 3935(a). Because GEM had committed to pay the entire paving amount to Dunbar, including Roth's portion, for which there may have initially been some deficiencies, we cannot say that GEM was acting in bad faith in withholding payment from Dunbar prior to Conneaut's acceptance and payment to GEM pursuant to the settlement agreement.

## ROTH V. CONNEAUT

The claim of Roth against Conneaut for unjust enrichment will be dismissed, as having been made in the alternative to the preceding claims, which were decided in favor of Roth.

## CLAIMS FOR INDEMNITY AND/OR CONTRIBUTION

### GEM V. ROTH

Based on the findings set forth above, we find in favor of Roth, and will dismiss the claim.

### FIDELITY V. ROTH

Based upon the foregoing findings, we find in favor of Roth and will dismiss the clam.

### CONNEAUT V. GEM and FIDELITY

The claims of Conneaut against both GEM and Fidelity for indemnity and/or contribution will be dismissed as moot because of our finding in favor of Conneaut on Dunbar's claim, and the dismissal of Roth's claim against Conneaut as having been stated in the alternative to its claims against GEM.

### FIDELITY V. CONNEAUT

On the claim of Fidelity against Conneaut for indemnity, the Court notes that, while the claim was never answered, it does not mature until entry of our verdict. We, accordingly, make no ruling on this claim.

Accordingly, we enter the following Verdict:

# VERDICT

John F. Spataro, J.

AND NOW, this **7th** day of **December, 2016**, following a bench trial, the verdict of the Court is as follows, summarized in the table below:

| Action | Prevailing Party | Principal Damages | Interest | Penalty | Attorney Fees & Expenses | Total |
|---|---|---|---|---|---|---|
| Dunbar v. GEM | Dunbar | $78,074.94 | $37,630.00 | $69,616.89 | $45,306.91 | $230,628.74 |
| Dunbar v. Fidelity | Dunbar | $78,074.94 | $37,630.00 | | | $115,704.94 |
| Dunbar v. Conneaut | Conneaut | | | | | N/A |
| Conneaut v. Dunbar | not pursued | | | | | N/A |
| GEM v. Roth | Roth | | | | | $0 |
| Roth v. GEM | Roth | $52,278.06 | $21,921.96 | $46,321.53 | $39,940.10 | $160,461.65 |
| Roth v. Conneaut | N/A | | | | | N/A |
| Claims for Indemnity and/or Contribution | | | | | | |
| GEM v. Roth | Roth | | | | | N/A |
| Fidelity v. Roth | Roth | | | | | N/A |
| Conneaut v. GEM | N/A | | | | | N/A |
| Conneaut v. Fidelity | N/A | | | | | N/A |
| Fidelity v. Conneaut | no ruling | | | | | |

1. On the claim of Dunbar Asphalt Products, Inc. and Dunbar Asphalt, LLC (collectively, "Dunbar") against GEM Building Contractors and Developers, Inc. ("GEM") for breach of contract, the Court finds in favor of Dunbar and enters judgment against GEM in the amount of $230,628.74, equal to the sum of the following:

   a. Principal damages in the amount of $78,074.94; plus

   b. Interest at the rate of 6% per annum from November 26, 2008, in the amount of $37,360.00; plus

   c. Penalty of 1% per month from July 8, 2009, in the amount of $69,616.89; plus

   d. Attorney fees and expenses in the amount of $45,306.91 (subject to adjustment through subsequent proceedings).

   The judgment will accrue interest in the per diem amount of $12.8342, and penalty in the per diem amount of $26.0250, for a total per diem amount of $38.8592.

2. On the claim of Dunbar against Fidelity and Deposit Company of Maryland ("Fidelity"), for breach of surety contract, the Court finds in favor of Dunbar and

enters judgment against Fidelity in the amount of $115,704.94, equal to the sum of the following:

    a. Principal damages in the amount of $78,074.94; plus

    b. Interest at the rate of 6% per annum from November 26, 2008, in the amount of $37,630.00.

The judgment will accrue interest in the per diem amount of $12.8342.

3. On the claim of Dunbar against Conneaut School District ("Conneaut") for unjust enrichment, the Court finds in favor of Conneaut and DISMISSES the claim.

4. The counterclaim of Conneaut against Dunbar was not pursued, and is therefore DISMISSED.

5. On the claim of GEM against John Roth, d/b/a Roth Paving, a/k/a JR Roth Paving, a/k/a Pave Masters J.M. Roth's (collectively, "Roth") for breach of contract, the Court finds in favor of Roth and DISMISSES the claim.

6. On the counterclaims of Roth against GEM for breach of contract and violation of the Prompt Pay Act, the Court finds in favor of Roth and enters judgment against GEM in the amount of $160,461.65, equal to the sum of the following:

    a. Principal damages in the amount of $52,278.06; plus

    b. Interest at the rate of 6% per annum from November 25, 2009, in the amount of $21,921.96; plus

    c. Penalty of 1% per month from July 8, 2009, the amount of $46,321.53; plus

    d. Attorney fees and expenses in the amount of $39,940.10 (subject to adjustment through subsequent proceedings).

The judgment will accrue interest in the per diem amount of $8.5936, and penalty in the per diem amount of $17.4260, for a total per diem amount of $26.0196.

7. The counterclaim of Roth against Conneaut for unjust enrichment is DISMISSED, as having been made in the alternative to the preceding counterclaims against GEM, which are decided in favor of Roth.

8. On the claim of GEM against Roth for indemnity, the Court finds in favor of Roth and DISMISSES the claim.

9. On the claim of Fidelity against Roth for indemnity, the Court finds in favor of Roth and DISMISSES the claim.

10. The crossclaims of Conneaut against GEM and against Fidelity for indemnity and/or contribution are DISMISSED as moot.

11. The Court makes no ruling on the crossclaim of Fidelity against Conneaut for indemnity.

BY THE COURT,

_____
Judge

_____ attys

12-7-16

17